FILED

MAY 01 2017
05-01-17
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

Robert Vaughan
*Petitioner, Pro Se*

Criminal Case Number
14-CR-639

v.

1:17-cv-03293
Judge Samuel Der-Yeghiayan
Magistrate Judge Daniel G. Martin
[1:14-cr-00639-1]

United States of America
*Respondent*

**MEMORANDUM OF LAW IN SUPPORT**
**OF PETITIONER'S 28 U.S.C. §2255 MOTION**

Comes Now Robert Vaughan, Petitioner Pro Se and for his cause in the above

styled and titled Action asks this Honorable Court to accept this Memorandum of Law in

Support of Petitioner's 28 U.S.C. §2255 Motion and grant him his requested relief.

In support of this request the Petitioner, will show the court, to the best of his

abilities, that his requests is non-frivolous and contains the requisite legal justification to

be reviewed and granted by the Honorable Court.

Petitioner further shows the Honorable Court he is unlearned in the law and

requests this and all Pleadings and submissions he presents for consideration in this Action

be construed under the auspices established by and pursuant to *Haines v. Kerner, 404 U.S.*

*519, 30 L.Ed. 2d 652, 92 S.Ct. 594 (1972)* wherein it is stated by the Justices in part;

"Pro Se litigant's pleadings are to be construed liberally, granted great latitude and held to

a less stringent standard than that of formal pleadings drafted by attorneys and it is in the

interest of justice to do so." The Justices went on to opine, "If the Court can reasonably

read the pleading to state a valid claim on which the litigant could prevail and the judge can see what he is driving at that ought to be enough and it should do so despite the failure to cite proper legal authority, confusion of legal theories, poor syntax and sentence construction or the litigants unfamiliarity with pleading requirements."

Petitioner makes this request in the interest of justice and to present issues to the Court he strongly feels are viable and important to his bar and therefore requests such interpretation.

The Petitioner contends that the government has overstepped the bounds of law afforded to them in the course of developing their scheme to cause him to unwillingly participate in, and to violate the law(s) of the United States of America.

In *Sorrells v. United States, 287 U.S. 435, 77 L.Ed. 413, 53 S.Ct. 210 (1932)* the Supreme Court held that a showing of "the inducement of individuals, by government officials, to commit crimes not otherwise contemplated by the individuals, in order that the individuals may be prosecuted for such crimes - will constitute a defense for such individuals against federal criminal charges." (§3[a], infra). The Petitioner wishes such application to the instant case.

In accord with the findings and ruling of the Supreme Court the Petitioner will show, (1) the government officers or agents induced the Petitioner to commit the offense in question, and (2) the Petitioner was not predisposed to commit such an offense. Furthermore, the Petitioner understands that the defense of entrapment may not apply if it is shown that the officers or agents' merely provided [him] with opportunities for the commission of the alleged offense. The Petitioner asserts that the government created and caused the offense in a manner consistent with the aims for which the Supreme Court has expressly forbidden.

The Petitioner was targeted for inclusion into participating in the charged offense when CS1, a former police officer with the Lyons Police Department, struck a deal with the Federal Bureau of Investigation when he found himself in a compromising position in

violation of extortionate activity. CS1 made promises to the government that he would induce Defendants Kogut and Vaughan to perform a robbery of a drug dealer wherein federal agents could then levy new case charges against them in exchange for lenient treatment for CS1. CS1 directly targeted the two Defendants because (1) he was familiar with them and had performed law enforcement duties with them in the past, (2) was familiar with their families and maintained a social relationship primarily with Kogut but to a lesser degree- Vaughan, (3) knew that Vaughan was suffering from Post Traumatic Stress Disorder caused by a recent work related incident which rendered Vaughan more readily influenced to manipulation and extortion under pressure.

The Petitioner asserts that his Post Traumatic Stress Disorder (PTSD) has created a mental disorder, defect, or subnormal resistance to inducements which has made him more susceptible than the usual person to persuasion by government agents or rendered him incapable of forming the specific state of mind required for the offense.

Over the several months that CS1 sought the Defendant's voluntary participation into the robbery scheme, Vaughan repeatedly refused to have any part in the plan or to pay CS1 any amount of money from his personal account to CS1, as he had requested for the purpose to support his family in light of his recent troubles with the federal government. In an effort to gain compliance from Vaughan to participate in the government's scheme to commit the contrived robbery, CS1 threatened harm and retaliation against Vaughan and his family if he continued to refuse to cooperate with him. CS1 agreed to release him from any and all further obligation to him if Vaughan would do this 'one thing' for him and agree to pay him money from the proceeds of the robbery.

In *United States v. Archer, 486 F.2d 670 (2nd Cir.1973)* the court weighed four factors in sustaining the propriety of the undercover operation: (1) whether the prosecutor manufactured a crime that would not likely have occurred otherwise; (2) whether the government's conduct was criminal or was reasonably justified; (3) whether the government used improper inducements or solicitations; and (4) whether the prosecutor

acted in good faith and not for venal reasons.

The Petitioner contends that the government has contributed, in uncommonly substantial ways, to the completion of all parts and phases of their contrived operation to entrap him in committing the very criminal act which the Petitioner had refused to perform numerous times before he acquiesced to CS1's inducements.

In fact, in *Russell* and *Hampton* the Court expressly announced that law enforcement practices might be sufficiently outrageous that due process would bar the government from invoking judicial processes to obtain a conviction. (see also *United States v. Russell, 411 U.S. 423*).

Although the concept of outrageous conduct is highly subjective, some courts have attempted to provide principled criteria to evaluate such claims. Relevant factors include the presence or absence of a factual basis for targeting persons into committing crimes, whether law enforcement was investigating present crime or was instigating new crime, the government and societal costs involved in the operation , the necessity for the undercover technique, the nature and extent of the inducements, the extent of the government's participation in criminal activity, whether the government violated individual rights, whether and to what extent the government made deliberate efforts to render ambiguous the events over which the agents could exercise control, and the extent of harm to individuals and societal values caused by the investigative methods.

Additionally, in a recent court decision by United States Court Judge Manuel Real, the Court chastised the government for over-involvement into the creation, implementation and execution of "outrageous" sting-operations, similar to the one used against the Petitioner, wherein Judge Real stated, "Federal Agents had created the fictitious crime from 'whole-cloth' and their conduct was unconstitutional and their scheme violated suspect's Constitutional Due Process rights." (citation omitted). In *Yuman-Hernandez, 712 F.3d 471* the court discussed the concept and practice of the government inflating the quantity of drugs for the purpose of obtaining a greater sentence for the Defendant wherein

they stated, "this is also a case that states that the government can so easily manipulate the facts surrounding a fictitious 'robbery' and the issue raised here is did the government's agent inflate the quantity of drugs in the scheme to make the Defendant's punishment more severe?"  The Petitioner asserts that this is of the very issues he now brings to light in consideration of the fact that the government, in their reports that they had 70 lbs. of Marijuana in the trunk of the 'bait' vehicle is in stark contrast to the 100 lbs. of Marijuana the government has proposed that this Court sentence him for at a rate commensurate with 300/lbs. equaling $300,000.  Furthermore, the Petitioner was additionally duped into accepting a plea deal wherein he was to accept responsibility for possessing and receiving the drug quantities which were part of CS1's prior criminal acts and had nothing to do with any criminal activity or involvement by the Petitioner.

"The preservation of the purity of its own temple belongs only to the Court" and that only judicial opinions, by declaring explicit standards of behavior, can "give significant guidance for official conduct for the future."  Such judicial determination can take place at a hearing either before trail, or after trial.  *United States v. Myers, 527 F.Supp. 1206 E.D.N.Y. (1981); United States v. Hollingsworth, 9 F.3d 593 (7th Cir.1993); Sorrells v. United States, 287 U.S. 435;* and also *Sherman v. United States, 356 U.S. 369 (1958).*

The Petitioner declares that he qualifies to receive consideration that his is an affirmative defense to the 'outrageous government conduct' pervasive throughout the investigation against him.

Some jurisdictions require a defendant to show a fairly significant degree of governmental inducement to raise the entrapment defense.  *United States v. Spain, 536 F.2d 170 (7th Cir.1976).  United States v. Mayfield, 771 F.3d 417 (7th Cir.2014).*

The language in *Mayfield* suggests that solicitation of a crime may require initiation or suggestion  or furnishing the opportunity to commit the crime.  Also, Mayfield suggest that even more is required to show inducement.  A related complication involves the role

of "extraordinary inducement." This phrase appears throughout entrapment cases. Sometimes even minor government inducements may be sufficient in some cases. See *United States v. Plowman, 700 F.3d 1052 (7th Cir.2012).*

It is the Petitioner's claim that the government has overstepped the bounds of their lawfully authorized rights in enforcing existing law into the realm of the unlawful creation of crimes, participation in criminal acts to effect the commission of those crimes and the deliberate and intentional extortion of participation and involvement in executing those crimes by persons, such as the Petitioner, who otherwise refused or objected to involvement but for the inducements by the government. From its inception, the government has caused, (1) the Petitioner to perform his lawful duties as a police officer, acting as back-up and support, in a government scheme to catch CS1 (Rogers) in an extortionate plan to steal cigarettes and money from a local businessman, (2) CS1 to invade the homes and family security maintained by the defendants causing them to fear for the safety of their families unless they agreed to participate in the government's scheme, (3) the Defendants to be subjected to numerous extortionate acts by CS1 wherein CS1 was paid $50,000 by Kogut to temporarily purchase CS1's silence in matters related to further extortion and to hold him in abeyance from making false, incriminating statement to the FBI about them, (4) sought to extort not only the involvement and participation of the Petitioner but required him involve, use or otherwise exploit the accoutrements and services of the law enforcement agencies by which the Defendant's were employed or otherwise were involved with Joint Task Force authorization, (5) conversations to be recorded via use of a wired microphone worn by CS1 which captured communications between CS1 and Vaughan that made it known, or who should have known that the Petitioner was an unwilling participant in the scheme and that he ultimately agreed to pay CS1 all of the proceeds from the scheme if CS1 agreed to leave the Petitioner alone in the future.

The Supreme Court in *Sherman v. United States, 356 U.S. 369* has compared undercover methods that entice innocent persons into crime with constitutional violations involving coerced confessions and unlawful searches, and also found certain entrapment-like conduct violative of due process. (see also *Cox v. State of Louisiana, 379 U.S. 559*).

The *Russell* and *Hampton* decisions set forth an objective test which examines whether the inducements would have caused a hypothetically innocent person to commit the crime. See also *Sherman v. United States 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed 2d 848 (1958)*.

In light of the above indicated series of operative events constituting violative conduct by agents of the government, the Petitioner avows that the government's interests and exercise in the above qualify as 'outrageous conduct' under the auspices of the newly adjudged terms of the court which state, "...the Circuit has expounded a new, totality-of-the-circumstances standard that a court must consider in assessing the outrageousness of the Government's conduct, the Circuit has stated that a court should consider whether a defendant had a criminal background or propensity the government knew about when it initiated its sting operation; (1) known criminal characteristics of the defendants; (2) individualized suspicion of the defendants; (3) the government's role in creating the crime of conviction; (4) the government's encouragement of the defendants to commit the offense[ive] conduct; (5) the nature of the government's participation in the offense conduct; and (6) the nature of the crime being pursued and necessity for the actions taken in light of the nature of the criminal enterprise at issue. The burden, at least in reverse-sting cases, is on the Government to establish that it's conduct does not surpass due-process limitation." *United States v. Dunlap_____9th Cir. 2014.*

The Petitioner wishes for consideration using the above referenced and adopted standard in the matter now before this Honorable Court.

**The amending of the Statute and the erroneous enhancement of the Defendant**

The Petitioner asserts that the unmerited application of 'double-dipping' as applied against him in the sentencing phase of his conviction has resulted in a failure to appropriately apply his punishment in accordance with the laws and guidelines. The Petitioner also avers that had he been given the opportunity to provide this Court with his informed consent, he would have objected to the unwarranted application of the guidelines at the time of sentencing or would have proceeded to trial lest he be intentionally punished for crimes which he otherwise could not have been held accountable for failure to meet the essential elements of the offense. The Fifth Amendment guarantees that a criminal defendant will be tried only on charges alleged in a grand jury indictment. The indictment cannot be "broadened or altered" except by the grand jury. A constructive amendment occurs when the trial court "through its instructions and facts it permits in evidence, allows proof of an essential element of a crime on an alternative basis permitted by the statute but not charged in the indictment." *United States v. Doucet 994 F.2d 169.* An indictment "must be plain, concise and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. Procedure 7(c)(1). "Generally, an indictment is sufficient if it sets forth the elements of the charged offense so as to ensure the right of the defendant not to be placed in double jeopardy and to be informed of the offense charged." *United States v. Rodriguez 360 F.3d 949 9th Cir. 2004 citing United States v. Woodruff 50 F.3d 673.*

The Petitioner further contends that he was permitted to be convicted by a factual basis that effectively modifies one or more of the essential elements of the charged offense.

The Petitioner demonstrates that a variance to his indictment has occurred because the charging terms of the indictment are left unaltered, but the evidence offered at trial proves facts materially different from those alleged in the indictment. Generally, a variance involves a divergence between the allegations set forth in the indictment and the proof offered at trial. A non-prejudicial variance arises when an immaterial divergence

arises between the facts alleged in the indictment and those offered at trial. A variance to an indictment occurs where the government presents evidence of one set of facts with a single divergence. A variance requires acquittal only where the divergence between the indictment and the case made at trial acts to prejudice the defendant's rights. The Petitioner asserts that his has been a prejudicial variance warranting correction and acquittal by reversal.

"After indictment has been returned and criminal proceedings are underway, the indictment's charges may not be broadened by amendment, either literal or constructive, except by a grand jury itself." *Stirone v. United States 361 U.S. 212.*

The Petitioner contends that the government's assertion that he used 'force or violence' is directly disputed by Agent Moore's Criminal Complaint against him and by the observations and video capture of the events in question as they unfolded. The Petitioner, as well as Defendant Kogut, had not used 'force or violence' in any manner when they contacted the government's UC agent. In fact, the UC agent voluntarily led the Defendant's to the area of his vehicle which held the contraband and allowed himself to be placed in handcuffs without forceful application. There was no qualification that either of the Defendants used violence in any manner during the events in question. Robbery itself can no longer be assumed to be a crime of violence as this issue has been decided by the courts in numerous Circuits where it has been held that 'robbery' is *not* a crime of violence. *See United States v. Eason --F.3d--2016 WL 3769477 8th Cir., United States v. Jones --F.3d--2016 WL 3923838 2nd Cir., United States v. Dixon 805 F.3d 1193 9th Cir. 2015.* A variance requires dismissal only if it has affected the defendant's substantive rights and the defendant could not have anticipated form the indictment what evidence would be presented at trial. An amendment occurs where (1) the government presents facts at trial distinctly different from those set forth in the charging instrument, or (2) the crime charged was altered to the extent at trial, that it is impossible to know whether the grand jury would have indicted the defendant for the crime actually proved. A variance

occurs "when the charging terms of the indictment are left unaltered, but the evidence offered at trial proves facts materially different from those alleged in the indictment." *United States v. Von Stoll 726 F.2d 584 9th Cir. 1984.* The Petitioner believes this holding by the court is consistent with the many alterations with the case at issue.

Additionally, the Petitioner further exemplifies his point by showing the government has attempted to gain jurisdiction over this matter by their inclusion of 70 lbs. of 'bait' Marijuana derived from their supply of materials. The Petitioner objects to the conclusion that because the included material is a controlled Substance, namely Marijuana, that fact alone does not qualify the government to claim jurisdiction over this matter because not all Marijuana is meant to be included in Congress' intent to control it as a regulated activity thereby affecting Interstate Commerce.

The fact that the Marijuana in question was not cultivated, possessed or otherwise used for medical purposes and was derived from the government's police impound locker means that this material was not ever *in commerce* nor does it qualify for inclusion as an otherwise regulated activity for which the government maintains a legally protected interest. See *Gonzales v. Raich 162 L.Ed 2d 1, 545 U.S. 1.* It is the Petitioner's contention that to construe this material otherwise, specifically the 70 lbs. of Marijuana, would open the door for an overwhelming intrusion into the state's sovereignty and would cause aspects of all materials to fall under the jurisdiction of the Federal Government. This issue has been addressed by the Supreme Court to which they have opined that there exists a limit to the authority of the Federal Government to which they may not exercise jurisdiction over matters clearly within the purview of the State. Justice Scalia concurred in this holding by stating, "(1) activities that merely substantially affect interstate commerce *are not* part of interstate commerce, and thus the power to regulate them cannot come from the commerce clause *alone;* (2) Congress' regulatory authority over intrastate activities that are not part of interstate commerce derives from the Constitution's necessary and proper clause (Art. I, §8, cl. 18); and (3) where necessary to make a *regulation of*

interstate commerce effective, Congress may regulate even those intrastate activities that do not substantially affect interstate commerce." Furthermore, Justice O'Connor joined in the views held by Scalia and the other Justices by declaring, "(1) the Supreme Court's decision in the instant case sanctioned an application of the Controlled Substances Act that extinguished California's experiment without any proof that the personal cultivation, possession, and use of Marijuana *for medicinal purposes*, if economic activity in the first place, had a substantial effect on interstate commerce and was therefore an appropriate subject of federal regulation; (2) in so doing, the Court announced a rule that gave Congress an incentive to legislate broadly pursuant to the commerce clause, rather than with precision; and (3) that rule and the result it produced...were irreconcilable with prior Supreme Court decisions."

The Petitioner is in assent that Congress has the ability to regulate purely local activities which would otherwise remain within the purview of the State, but only if that activity was part of an economic "class of activities" that have a substantial effect on interstate commerce such as the medicinally regulated class of substances made legitimately available for public use. The Marijuana produced and used by the government in the instant matter does not qualify for such consideration because it was produced and held by the government for its own purposes, not for commercial purposes and therefore does not meet the minimum requirement that was Congress' intent to regulate this material outside of the realm of their intended controls. The Petitioner wishes such determination to be made in the instant matter consistent with the opinion of the Supreme Court.

Finally, the Petitioner addresses the contrivance of the government in their scheme to entrap him under the pretense that their shipment of Marijuana originated in the State of Texas and was enroute from Texas to the State of Illinois via means of a motor vehicle which was rented in Texas. It is the Petitioner's contention that the numerous reasons giving rise to the Federal jurisdictional nexus have clearly been established through

fabrications by the government actors who concocted the scheme from the onset. It is apparent from the lengthy efforts and measures implemented here that the government has sought to create their own jurisdictional elements by their creation of; (1) their transportation of controlled substances across State lines, (2) their use of a motor vehicle whose origin stems from its rental from across State lines, (3) their utilization of the interstate highway system as a means of creating the interstate nexus, and (4) their inclusion of a controlled substance, namely Marijuana, which they chose to obtain from sources where its emergence was created from outside of the State of Illinois and brought into the State for the purpose of creating the illusion of the interstate commerce situs.

The Petitioner objects to the contrivances imposed by the government and asserts that the multiple fabrications, and out-of-state implementations have created an impermissible foundation of outrageous government involvement which has altered this scheme to be overly intrusive and violative of the Petitioner's rights against unlawful government involvement and which have further caused the overall nexus for this scheme to qualify for consideration(s) under the Petitioner's entrapment claims. It is the Petitioner's claim that the government has maintained a consistent pattern of over-involvement in the creation, implementation, instigation and inducement, and the overall execution of events which have caused the robbery scheme to conclude only with the assistance of the government's Undercover Agent. Were it not for the UC agent's deliberate and cooperative actions in guiding the Petitioner into his locked and secured trunk where he had hidden his Marijuana, the Petitioner could not have gained access to the contraband without having first obtained authorization from a court by way of search warrant. It is the Petitioner's assertion that the UC did not object, refuse or otherwise oppose the investigative actions of the Defendants, regardless of his belief that they had contacted him for the purpose of robbing him of his contraband, and that it was premature for the Federal investigative team to seize the Defendants before they had actually performed the robbery. Without this missing and necessary element, it is the Petitioner's

stance that he has not met the basic elements of the robbery scheme and that it is the government's reliance upon the conduct of their UC which they have used to justify this prosecution.

The Petitioner contends that the issue of manufactured jurisdiction has been well founded and held to be unconstitutional as a matter of law. As indicated above, the government has sought, through means and conduct of their own devises, to establish and implement jurisdiction of matters affecting the Petitioner which otherwise would not have existed but for the creation of such by the government. The Court in *Mandel* has opposed such conduct stating, "Mandel is left to rely on the notion that the government improperly 'manufactured jurisdiction' over his conduct by having Dwyer initiate calls to Mandel's cell phone in order to ensure Mandel's use of a facility of interstate commerce and thus establish a key element of the federal offense." *United States v. Mandel 647 F.3d 710 7th Cir. 2010, See United States v. Archer 486 F.2d 670 1973* which states, "The Second Circuit in Archer reversed defendants convictions under the travel act when the evidence disclosed that a federal agent had crossed state lines to place a telephone call to one of the defendants (which the defendant then returned) "for the precise purpose of transforming a local bribery case into a federal crime.""

Furthermore, the Court in *Archer* has reached similar, additional holdings as stating, "The actions of the Government's undercover agent, in inviting the parties under investigation for fixing cases to call him in Las Vegas, could not serve to bring defendants' wrongdoing within the scope of the act. The Government offered only one conversation in which telephone calls out of state were mentioned as part of the plan to agree to fix cases, and that conversation demonstrated that the undercover agent suggested the call to Las Vegas. The other call was alleged to have brought defendant's actions under the act was a call from the undercover agent in Paris to 'and the Government.'" Again, the interstate or international activity was initiated by the undercover agent. When the federal element in a prosecution under the act was furnished by an undercover agent,

as opposed to a suspect, a stricter standard applied to a finding that the act was violated.
*OUTCOME: The Court denied the Government's petition for a rehearing of the court's finding that defendants did not violate a federal act prohibiting interstate or foreign activities in the course of activities constituting an extortion offense."

Finally, the Court in *Coates* additionally held a consistent ruling in holding, "Defendant sought review of the decision of the United States District Court for the District of Maryland, which convicted him of one count of Murder-for-Hire through interstate commerce facility...the Government's actions could not provide a basis for jurisdiction for defendant's prosecution for arranging a murder for hire through the use of interstate commerce facilities because their actions were solely to manufacture jurisdiction." "Subsequent to the government agent driving [from Maryland to] Virginia for the sole purpose of making a telephone call across statelines in order to induce defendant to "use" that interstate facility to discuss the scheme, defendant was convicted. Federal jurisdiction in criminal prosecutions should not be recognized when patently contrived by means adopted solely for the purpose of creating a federal crime. Federal courts are under an obligation to scrutinize the government's apparent reasons for its actions whenever such a jurisdictional ploy is suggested." OUTCOME: "The Court reversed this district court's judgment of conviction on count one and remanded with directions to dismiss that count for lack of federal jurisdiction. The Court remanded count two for re-sentencing on defendant's count two conviction alone." *United States v. Coates 949 F.2d 104 4th Cir. 1991.*


## Jurisdiction and Judicial Power

"The requirement that jurisdiction be established as a threshold matter springs from the nature and the limits of the judicial poser of the United States' and is inflexible and without exception." *Steel Co. v. Citizens for a Better Envr., 533 U.S. 83, 118 S.Ct. 1003, 1009 (1998). Mansfield & LMR Co. v. Swan, 111 S.Ct. 379, 382, 4 S.Ct. 510, 511, 28*

*L.Ed 462 (1884)*. "Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." *Ex parte McCardle, 7 Wall 506, 514, 19 L.Ed 264 (1868)*. "Article III generally requires a federal court to satisfy itself of its jurisdiction over the subject matter before it considers the merits of the case." *Rurhgas Ag. v. Marathon Oil Co., 526 U.S. 574, 119 S.Ct. 1563, 1566 (1999)*. "Subject matter limitations on federal jurisdiction serve primarily institutional interest. They keep the federal courts within the bounds the Constitution and Congress have prescribed." *Rurhgas Ag ibid.*

"Federal courts are vested with the jurisdiction of criminal offenses which Congress had the power to define." *Andrese v. Redfield, 9 Otto 225, 25 L.Ed 158 (1879)*. "18 U.S.C. §3231 confers jurisdiction in the federal District Courts over cases involving all offenses against the United States." *United States v. Sasscer, 558 F.Supp. 33 (D.C. Md. 1982)*. "Offenses against the United States were not made cognizable in courts unless made so by Act of Congress." *United States v. Sheppard 558 F. Case No.16274 (C.C. Va. 1875)*. "Act of Congress is any act locally applicable to and in force in the District of Columbia, Puerto Rico, a territory or an insular possession." See e.g. Fed.R.Crim.Proc. Rule 54(c) Transferred.

**Statutory Construction**

The Petitioner recognizes that "the District Court has jurisdiction if the 'right of petitioners to recover under the complaint will be sustained if the Constitution and the laws of the United States are read one construction and will be defeated if they are given another." *Steel Co. v. Citizens for a Better Envr., supra @ 118 S.Ct. 1007*. The Statute alleged to have been violated in the Petitioner's complaint is 18 U.S.C. §1951 of diverse subsections, which begins with the words, "Whoever, in any way..." "Whoever" like "every person" or "anyone" is a term which must be contextually construed in statutory

readings. "[W]hoever" will be taken as a matter of course, to mean only everyone subject to the legislation at bar and not to mean all the legislator subsequently may be able to catch." *American Banana Co. v. United States Fruit Co., 213 U.S. 347, 357, 29 S.Ct. 511 (1909).*

"All legislation is *prima facie* territorial." *Ex parte Blain, 1 L.R. 12 Ch. Div. 522, 528.* "The canon of construction which teaches that the legislation of Congress, unless a contrary intent appears, is meant to apply only in the territorial jurisdiction of the United States." *Blackmer v. United States, 5284 U.S. 421, 437, 52 S.Ct. 252, 254, 76 L.Ed 375 (1932).* "[I]f the nature law does not mandate its extraterritorial application, then a presumption arises against such an application." *United States v. Mitchell 553 F.2d 996 (C.A. 5, Fla. 1977).* "To overcome the presumption and apply the statue beyond the territory of the United States, the Government must show a clear expression of congressional intent." *Steel v. Bulova Watch Co, 344 U.S. 280, 285, 73 S.Ct. 252, 97 L.Ed 319 (1952).*

The Petitioner demonstrates, by example of the Statute within Title 18 U.S.C. §1951 that does provide for extraterritorial application within the Special Maritime and Territorial jurisdiction of the United States defined by 18 U.S.C. §7. This Statute is 18 U.S.C. §1951(b)(3) wherein it is stated, "...means commerce within the District of Columbia, or any Territory or Possession of the United States." However, the Petitioner is charged with violation of 18 U.S.C. §1951- Attempted Robbery which is defined under 18 U.S.C. §1951(a) and 18 U.S.C. §1951(b)(1), which are silent as to the application of any extraterritorial utilization or enactment. "A silent Statute is presumed to apply only domestically." *Smalls v. United States 544 U.S. 385, 388 125 S.Ct. 1752 (1999).* To assist in the analysis of the Statute's construction the Petitioner uses case law from a decision on venue. While the Petitioner is not asking the Court to address conditions as ones specifically pertaining to 18 U.S.C. §3232, he does assert that there are several

elements of venue and subject matter jurisdiction which are common to both analyses; Most notably the location(s) of the acts constituting the *locus delecti* of the activity. "We must look to the Statute defining the crime to determine the location of the crime for the purpose of venue. If the statute 'does not indicate a method for determining the location of the crime...the location must be determined from the nature of the crime alleged **and** the location of the acts constituting it." *United States v. Lanoue, 137 F.3d 656 (C.A. 1 R.I, 1997); United States v. Anderson, 328 U.S. 699, 703, 66 S.Ct. 1213, 1216, 90 L.Ed 1529 (1946).* The court in *Lanoue,* held, "To determine the locations of a continuing crime we must look to the key verbs of the statute in question." "18 U.S.C. §922(g) makes it unlawful for a convicted felon to '**possess** in or affecting commerce, any firearm.' Only where *Lanoue* actually **possessed** a firearm would venue be proper." *Lanoue,* ibid. Quoted in *United States v. Cabrales 524 U.S. 1, 118 S.Ct. 1772, 1778, 141 L.Ed 2d 1, 7 (1998).*

The Petitioner does not digress into any analysis of subject matter jurisdiction in *Lanoue,* as that issue was not raised by *Lanoue* nor addressed by the Court. The Petitioner only relates the geographical location defining the situs of the crime in *Lanoue's* case, for the purpose of venue, as that place where the activity proscribed by the statute occurred. However, the Petitioner does raise the issue of co-extension of the statute's proscribed activity and the geographical situs of the alleged activity in his own case as a question of subject matter jurisdiction to this Court.


18 U.S.C. §1951(a)-

"Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce..."


The question at hand necessarily devolves on the apposite application of territory which necessarily addresses where the locus of the actual possession and obstruction of the

proscribed material ensued.  The Petitioner's alleged conduct is said to have occurred

wholly within the territorial jurisdiction of the United States or any property owned by, or

ceded by Title 40 U.S.C. §255, to the United States.  As for the Statute, "[t]he necessary

locus, when not specifically defined, depends upon the purpose of Congress as evinced by

the description and the nature of the crime and upon the territorial limitations upon the

power and jurisdiction of a government to punish crime under the law of nations.

Crimes...which affect the peace and good order of the community must, of course, be

committed within the territorial jurisdiction of the government where it may properly

exercise it.  If punishment of them is to be extended to include those outside of the strict

territorial jurisdiction, it is natural for Congress to say so in the Statute, and failure to do

so will negate the purpose of Congress in this regard." *United States v. Lopez-Vanega*

*493 F.3d 1305, 1309 (2007); United States v. Bowman 260 U.S. 94, 97, 98; 67 L.Ed 149*

*(1922)*.  The Petitioner asserts that there is no application of any extraterritorial

jurisdiction ceded to the government in the application of this crime against him.

Clearly, it is stated in 18 U.S.C. §7; "Special maritime and territorial jurisdiction

of the United States defined- the term "special maritime and territorial jurisdiction of the

United States" as used in this title, includes:

(1) The high seas, any other waters within the admiralty and maritime jurisdiction

of the United States and *out of the jurisdiction of any particular State,* and any vessel

belonging in whole or in part to the United States or any citizen thereof, or to any

corporation created by or under the laws of the United States, or of any State, Territory,

District, or possession thereof, when such vessel is within the admiralty and maritime

jurisdiction of the United States *and out of the jurisdiction of any particular State*.

(emphasis added).

It is absolute, as stated twice within the above definition, that it was Congress'

intent to specifically acknowledge that there exits territory within a State whereupon there

is no jurisdictional claim within which the government of the United States may

incorporate or intrude. It is the Petitioner's position, as applies to the case at bar, that the government has intruded upon the sovereign jurisdiction of the State of Illinois.

Furthermore, as it is plainly stated in 18 U.S.C. §10- Interstate commerce and foreign commerce defined: The term "interstate commerce," as used in this title, includes commerce between one State, Territory, Possession, or the District of Columbia and another State, Territory, Possession, or the District of Columbia.

The term "foreign commerce," as used in this title, include commerce with a Foreign Country. (emphasis added).

The Petitioner asserts that Congress, having demonstrated their ability to clearly delineate their intended breadth in the construction of a Statute has additionally indicated that it is the commerce of which the State belongs, non-inclusive of illicit, private commerce between its citizens or citizens of the several states, which is considered in its definition. This conception has been demonstrated in the court's numerous rulings as in *Gonzales v. Raich, 545 U.S. 1, 162 L.Ed. 1, 125 S.Ct. 2195* which provides for jurisdiction over marijuana manufacture and possession, as applied to regulated intrastate manufacture and possession for medical purposes and not over the illicit sales and distribution of such between private individuals; *United States v. Lopez, 514 U.S. 549, 131 L.Ed. 626, 115 S.Ct. 1624* wherein the Court held that prohibiting possession of a firearm in a school zone, despite that firearm having travelled in interstate commerce, exceeded the authority of Congress to regulate commerce under the Federal Constitution's commerce clause (Art I, §8, cl. 3); and in *United States v. Morrison, 146 L.Ed. 658, 529 U.S. 598* the Court held that Congress had no authority to enforce 42 U.S.C. §13981 under either the commerce clause or §5 of the Fourteenth Amendment because (1) gender-motivated crimes of violence were not in any sense of the phrase economic activity, (2) there was no jurisdictional element establishing that a federal cause of action was in pursuance of Congress' power regulate interstate commerce; (3) the Constitution required a distinction between what was truly national and what was truly local; (4) there

was no better example of State police power than the suppression of violent crime and the vindication of victims; and (5) §13981 was directed at individuals who had committed criminal acts motivated by gender bias, rather than at a State or State actor.

The Petitioner further asserts that these Statutes were designed to be consistent with the unlimited police powers of Congress under Article I, §8, cl. 10 & 17 and Article IV, §3, cl. 2 to ensure that the police powers, reserved for the several States are not invaded.

## CONCLUSION

"[C]ause of action is a question of whether a particular plaintiff is a member of the class of litigants that may, as a matter of law, invoke the power of the court" *Davis v. Passman, 442 U.S. 228, 240 (1979).* "The Petitioner asserts that the Government of the United States has no police power under the Constitution or these particular laws of the United States to invoke this Court's judicial power for the given circumstances alleged in this action." To do so would be an assault on the dignity of the Sovereign, the State of Illinois, an assault on the Constitution and a violation of international law. "Whenever it appears that the court lacks jurisdiction of the subject mater, the court shall dismiss the action" *Rurhgas Ag v. Marathon Oil Co., 526 U.S. 574, 119 S.Ct. 1563, 1566 (1999).*

Justice Brandeis - United States Supreme Court in *Olmstead v. United States, 277 U.S. 438 (1928)-* "In a Government of Laws, existence of Government will be imperiled if it fails to observe the law scrupulously. Our Government is the potent, the omnipotent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the Government becomes a law breaker, it invites anarchy. To declare that in the administration of the criminal law ends justify the means- to declare that the Government may commit crimes in order to secure the conviction of a private criminal- would bring terrible retribution. Against this pernicious doctrine, this Court should resolutely set its face." (Justice Brandeis, dissent)

WHEREFORE, for the above indicated reasons and for the reasons set forth in the Petitioner's previous 28 U.S.C. §2255 submission the Petitioner request this Court to Vacate, Set Aside or Correct his Sentence in accord with his previous request.

## VERIFICATION

I have read the foregoing "Memorandum of Law In Support of Petitioner's 28 U.S.C. §2255 Motion" and hereby verify that the matters alleged herein are true, except as to matters alleged on information and belief, and as to those, I believe them to be true and correct. Executed at Forrest City, Arkansas on this 27th day of April, 2017.

Robert Vaughan
*Petitioner, Pro Se*

## CERTIFICATE OF SERVICE

I certify under the penalty of perjury that the foregoing "Memorandum of Law In Support of Petitioner's 28 U.S.C. §2255 Motion" was placed in the prison's internal mail system, postage pre-paid, for service upon this Court via U.S. mail on this 27th day of April, 2017 to Clerk of Court Everett McKinley Dirkson Building 219 South Dearborn Street, Chicago, IL 60604. The Petitioner asks this Court's Clerk to serve all other interested parties by electronic notification.

Robert Vaughan
*Petitioner, Pro Se*
P.O.Box 9000-Low
Forrest City, AR 72336